UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MONOTYPE IMAGING, INC.; LINOTYPE GMBH; AND INTERNATIONAL TYPEFACE CORPORATION,<br><br>Plaintiffs,<br><br>v.<br><br>DELUXE CORPORATION<br><br>Defendant. | Civil Action No. 1:11-cv-11985-NMG |

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION TO DISMISS COUNTERCLAIMS**

Defendant and Counterclaim Plaintiff Deluxe Corporation ("Deluxe") hereby opposes the Motion to Dismiss Counterclaims filed by Plaintiffs and Counterclaim Defendants Monotype Imaging, Inc., Linotype GMBH, and International Typeface Corporation (together, "Plaintiffs" or "Monotype").  Monotype's motion is premised on a disingenuous assertion that Deluxe has "admitted" to breaching the parties' 1996 Multiple Copy End User License Agreement (the "License"), and completely ignores the heart of the parties' dispute and the basis for Deluxe's claims that it is *Monotype* who has breached the License in retaliation for a failed business deal. In essence, as Monotype well knows, the parties' disagreement centers on interpretation of the term "Bitmap" as used in the License.  As Deluxe has previously explained to Monotype, the term "Bitmap" in the context of Monotype's License plainly does not encompass the static digital images of text rendered in a given typeface that Deluxe sends to its customers over the Internet, which Monotype cites as the basis for its allegations of breach.  Indeed, Monotype had

knowledge of Deluxe's activities for years and only complained after Deluxe chose another provider rather than Monotype for a new business opportunity, in an apparent case of "sour grapes." Deluxe is not in breach of the License, and Monotype's efforts to force Deluxe to pay additional fees for the exercise of its licensed rights amount to breach of the License's "undisturbed use" provision and a violation of Mass. Gen. Laws. ch. 93A, § 11 ("93A"). Monotype's continuing attempt to gloss over Deluxe's position and misrepresent the true scope of its own License only serves to compound its wrongful conduct. Deluxe has adequately pled both of its counterclaims, and Monotype's Motion to Dismiss should be denied.

## BACKGROUND

Monotype is in the business of designing and licensing typefaces and computer font software programs that can be used to create text rendered in those typefaces. Complaint ¶¶ 17-18. Deluxe is in the business of printing custom checks, forms, and other business products. Ans. ¶ 3. Deluxe allows its customers to specify not only the text that will appear on their printed products, but also the typeface in which that text will appear. C-Cl. ¶ 12. Deluxe renders customers' text in the selected typefaces through the use on its computers of font software programs, including font software programs licensed from Monotype pursuant to the 1996 License. C-Cl. ¶ 13.

Prior to the advent of Internet commerce, Deluxe advertised product and typeface options via catalogs or similar printed materials, accepted orders via telephone or mail, and sometimes sent customers paper "proofs" of customized products for approval before printing a full order. C-Cl. ¶ 12. Deluxe now allows customers to place orders over the Internet as well. C-Cl. ¶ 13. In the Internet-ordering model, customers specify text and typeface by making selections on

Deluxe's webpages. *Id.* Deluxe then prepares an electronic "proof" – a static image showing the customer's text rendered in the selected font in the form of a .swf or .jpg file – which it sends to the customer over the Internet for approval before printing a full order. *Id.* This electronic proof, like a paper proof, contains no embedded elements of the font software program that Deluxe used to create it, and is not subject to manipulation by the customer. *Id.*

The 1996 License at issue here conveys a perpetual license from Monotype to Deluxe to "use, reproduce, and display the Licensed Product(s)," as defined therein. Lic. ¶ 2.01.[1] As Monotype accurately points out, Deluxe's rights with respect to the Licensed Products are limited to use by Deluxe on its premises in connection with 100 printers. *Id.* Critically, however, the defined term "Licensed Product(s)" does <u>not</u> encompass images (whether paper or electronic) of text rendered in a Monotype font. "Licensed Product(s)" is defined to include "Outlines, Bitmaps, printer or screen fonts." Lic. ¶ 1.01(d). "Bitmap," in turn, is defined as "a machine readable digital representation of a single Typeface style in a fixed resolution, weight, width, format, and point size." Lic. ¶ 1.01(a). "Bitmap" is contrasted with "Outline," which is defined as "a machine readable digital representation of a single Typeface style, in a fixed weight, width, in Postscript Type 1 format, and that may be represented by varying resolutions." Lic. ¶ 1.01(f). "Bitmap" and "Outline" in this context refer to two different common formats for font software programs; the License thus prohibits Deluxe from transferring the font software programs – but not the output of those programs – to third parties off its premises.

---

[1] The License is attached to Monotype's Memorandum of Law in Support of Plaintiffs' Motion to Dismiss Defendant's Counterclaims (Docket No. 15) as Exhibit 1.

- 3 -

The License also states that "Deluxe shall be entitled during the term of this license to use the Licensed Products without disturbance, subject only to performance of its obligations hereunder." Lic. ¶ 8.06.

In 2010, Deluxe began preparing to launch a new web-to-print model, in which, in contrast to the Internet-ordering model, customers would have access to .pdf files that do contain embedded versions of font software. C-Cl. ¶ 15. Recognizing that its existing licenses might not cover this application, Deluxe sought bids, including from Monotype, for licensing font software to use in the "web-to-print" model. *Id.* Monotype submitted a bid but lost, and Deluxe does not use any of Plaintiffs' fonts in its "web-to-print" model. *Id.*

Following its failed bid for Deluxe's "web-to-print" business, Monotype began sending Deluxe correspondence asserting that Deluxe's longstanding Internet ordering practices exceeded the scope of the License and demanding that Deluxe cease using Monotype fonts in connection with that business and pay Monotype an unspecified additional fee in exchange for past use. C-Cl. ¶ 16. Monotype then brought the instant lawsuit against Deluxe alleging breach of the License and various counts of trademark infringement relating to Deluxe's use of Monotype font names to refer to Monotype's fonts. C-Cl. ¶ 17. By that time, Deluxe had been openly engaging in the Internet-ordering business of which Monotype complained for about a decade, and Monotype had constructive, if not actual, knowledge of Deluxe's use for many years. C-Cl. ¶¶ 13-14. As licensor under the License and as owner of alleged trademarks that it accuses Deluxe of infringing, Monotype had a duty to police the activities of licensees and the use of the alleged marks by third parties. C-Cl. ¶ 14. Monotype also had, under paragraph 3.03 of the License, a right to audit Deluxe's use of the Licensed Products. *Id.* Monotype's sudden

- 4 -

accusations of breach and demand for additional payment for Deluxe's previously licensed and long-exercised rights, shortly after losing out on a new business opportunity from Deluxe, gives a clear impression of a case of "sour grapes."

In response to Monotype's accusations, Deluxe has explained during the parties' detailed settlement negotiations that Monotype's purported interpretation of the defined term "Bitmap" to include Deluxe's static electronic proofs is contrary to the plain language of the License and the common understanding of such terms in the field. Monotype has not responded to this assertion and fails to even mention this fundamental issue in its Motion to Dismiss. Deluxe has incurred attorneys' fees and other expenses in responding to and defending against Monotype's unfounded accusations and demands and the present lawsuit. C-Cl. ¶ 30; Prayer for Relief ¶¶ 2, 3.

## ARGUMENT

### I. DELUXE IS ENTITLED TO, AND HAS BEEN DENIED, UNDISTURBED USE UNDER THE LICENSE

The Monotype License guarantees to Deluxe undisturbed use of its licensed rights, subject only to Deluxe's performance of its obligations thereunder. Deluxe's first counterclaim seeks relief for Monotype's breach of this guarantee. Monotype devotes the bulk of its argument for dismissal of this count to a contention that Deluxe has breached the License and therefore has no right to undisturbed use. Monotype's position, however, is based on a faulty – and pretextual – interpretation of a critical term in the License, the true meaning of which Monotype attempts to "sweep under the rug." Monotype also asserts that it has not disturbed Deluxe's use of its licensed rights. Where Monotype has done, and continues to do, everything in its power to force Deluxe to cease exercising its licensed rights, such protestations of innocence are unavailing.

**A. Deluxe's Activities Are Within the Scope of Its Licensed Rights.**

Monotype asks this Court to dismiss both of Deluxe's counterclaims because, it asserts, its behavior is justified by Deluxe's supposed breach of the License. For this argument to succeed, the Court would need to decide that Monotype's purported interpretation of the contractual term "Bitmap" is correct. Such a substantive ruling on a disputed issue of contract interpretation is inappropriate on a Rule 12(b)(6) motion to dismiss – particularly where the moving party has not even bothered to brief the issue. In any event, even if the Court were to take up the interpretive issue at this stage, Monotype's conclusory and unsupported gloss on the term "Bitmap" is plainly wrong. Moreover, if there were any doubt as to the proper reading of "Bitmap," the term must be construed against Monotype, as the drafter of the contract. *Current Tech. Concepts v. Irie Ents., Inc.*, 530 N.W.2d 539, 543 (Minn. 1995).[2]

Monotype asserts, without citing any authority either in the License or elsewhere, that the definition of the term "Bitmap" as "a machine readable digital representation of a single Typeface style in a fixed resolution, weight, width, format, and point size" means "digital bitmap images of rendered fonts," such as the electronic proofs Deluxe sends to its Internet customers. Mem. at 5, 9, 10. This argument takes advantage of the fact that the term "bitmap," in the general context of computer graphics, refers to an image file format in which the image is created by describing a spatial arrangement of dots (bits or pixels) on a computer screen.[3] In this general sense, the .jpg or .swf proofs that Deluxe sends to its Internet customers are indeed

---

[2] The License is governed by Minnesota law. Lic. ¶ 8.04.

[3] *See* Free Online Dictionary of Computing, definition of "bitmap," http://foldoc.org/bitmap (last visited April 27, 2012); Wikipedia, article on "bitmap," http://en.wikipedia.org/wiki/Bitmap (last visited April 27, 2012).

"bitmaps," in that they are graphic files that display an image created from an arrangement of bits.

As Monotype well knows, however, the term "bitmap" in the context of computer font software – and the defined term "Bitmap" in Monotype's License for computer font software – has a specialized and quite different meaning. "Bitmap" (also known as "raster") and "outline" (also known as "vector") are terms used to describe two different file formats in which computer font software programs can be stored.[4] In a bitmap font, the image of each character is stored as an array of pixels (*i.e.*, a bitmap). Free Online Dictionary of Computing, definition of "bitmap font," http://foldoc.org/bitmap+font (last visited April 27, 2012). Because of this fact, bitmap fonts appear pixelated when scaled to different sizes, and therefore bitmap font software generally comes with a complete set of characters for each different point size. Wikipedia, article on "computer font," http://en.wikipedia.org/wiki/Computer_font (last visited April 27, 2012). ("Point" is a unit of measurement for the size of printed text.) In contrast, outline fonts, which are often written in the PostScript computer language, describe characters by a set of lines and curves. Free Online Dictionary of Computing, definition of "outline font," http://foldoc.org/outline+font (last visited April 27, 2012); Wikipedia, article on "computer font," http://en.wikipedia.org/wiki/Computer_font (last visited April 27, 2012). Characters described in this way, unlike bitmap letterforms, can be scaled to any size without sacrificing quality; therefore, outline font software need not be provided with separate character sets for each point size. *Id.* Deluxe intends to present testimony demonstrating that the font software file

---

[4] *See* Free Online Dictionary of Computing, definitions of "bitmap font," http://foldoc.org/bitmap+font, and "outline font," http://foldoc.org/outline+font (last visited April 27, 2012); Wikipedia, article on "computer font," http://en.wikipedia.org/wiki/Computer_font (last visited April 27, 2012) (listing raster/bitmap, outline/vector, and stroke as the "three basic kinds of computer font file data formats").

formats just described were the commonly understood meanings of the terms "bitmap" and "outline" in the context of the computer font software field at the time Monotype drafted the 1996 License.

The text of the License itself confirms that the defined term "Bitmap" refers to the font software and not, as Monotype now contends, to an electronic image of text rendered in a given typeface. As noted, "Licensed Product(s)" is defined to include "Outlines, Bitmaps, printer or screen fonts." Lic. ¶ 1.01(d). In other words, the products being licensed include font software in either of the two main file formats for such software (outline or bitmap), for use in creating text on printers or computer screens. The License also contains definitions of "Bitmap" and "Outline" that are consistent with the characteristics of those file formats as described above. "Bitmap" is defined as "a machine readable digital representation of a single Typeface style in a fixed resolution, weight, width, format, and point size," while "Outline" is defined as "a machine readable digital representation of a single Typeface style, in a fixed weight, width, in PostScript Type I format, and that may be represented in varying resolutions." Lic. ¶ 1.01(a) and (f). These are "<u>machine readable</u> representations" – that is, software, not visual images (emphasis added). Moreover, the definition of "Bitmap" specifies that the representation of the typeface is in a "fixed . . . point size," while the definition of "Outline" does not; this makes sense in light of the fact that bitmap fonts cannot be scaled and must come with separate character sets for each individual point size, while outline fonts can be displayed in any point size. Finally, the definition of "Outline" indicates that the machine-readable representation is "in PostScript Type I format," a common file format for outline font software. Clearly, the term "Bitmap" as defined in Monotype's License refers to font software programs, not to the output of such programs.

Monotype does not even attempt in its motion to address the obvious implications of the License definitions, despite Deluxe's prior explanation that Monotype's proffered reading of "Bitmap" cannot be correct.  Instead, Monotype simply asserts, without acknowledging any potential dispute, that "Bitmap" refers to "digital . . . images of rendered fonts," including the electronic proofs Deluxe sends to its Internet customers.  Mem. at 5, 9, 10.  Moreover, Monotype admits that "[f]ont software programs . . . generate human readable renderings of typefaces," Mem. at 1, such as the electronic proofs at issue, but fails to suggest how a <u>human readable</u> image of rendered text could conceivably fall within the License's definition of "Bitmap" as "a <u>machine readable</u> digital representation" (emphasis added).  Monotype's reading of the License also ignores the corollary definition of "Outline," which is clearly presented as an alternative to "Bitmap," in line with the commonly understood meanings of those terms in the field of computer font software.  *See Brookfield Trade Ctr., Inc. v. Cnty of Ramsey*, 584 N.W.2d 390, 394 (Minn. 1998) ("We read contract terms in the context of the entire contract and will not construe the terms so as to lead to a harsh and absurd result.").  Monotype's proffered interpretation of "Bitmap" is plainly wrong, and its unsupported and conclusory allegations of breach must fail.[5]

---

[5] Rather than addressing the obvious fallacy in its argument, Monotype sets up and then attacks a straw man – namely, Deluxe's observation that the electronic proofs it sends to its Internet customers are pixelated and of low resolution.  Mem. at 10.  With respect to Monotype's invitation to the Court to take judicial notice that the sample proofs and webpages included in the Complaint are "as clear and crisp as the rest of the text in the Complaint," Mem. at 10 n.6, Deluxe submits that the exhibits are, in fact, pixelated and would become more so if enlarged to a usable size.  As Monotype acknowledges, however, this factual dispute is beside the point.  Contrary to Monotype's suggestion, Deluxe does not contend that the proofs are not covered by the License's restrictions because they are low-resolution; rather, as already explained, the proofs are not covered by the License's restrictions because they are not "Bitmaps."  The fact that they are low-resolution merely serves to further contrast them with the .pdf files used in Deluxe's newer "web-to-print" model, which do contain embedded versions of font software – though not, of course, any software originating from Plaintiffs.

Deluxe's Internet-ordering model does not involve transferring "Bitmaps" or any other Licensed Product(s) to customers or off of Deluxe's premises.[6]  Deluxe has performed all of its obligations under the License and is therefore entitled, under paragraph 8.06, to "use the Licensed Products without disturbance."

### B. Monotype Has Breached the License By Violating Deluxe's Right to Undisturbed Use.

Monotype argues that Deluxe has failed to allege a breach of the License's guarantee of undisturbed use because "[t]here are no allegations that Monotype . . . *took any steps whatsoever to prevent Deluxe from conducting its business as it has previously*."  Mem. at 8.  To the contrary, Deluxe has alleged that Monotype "has demanded that Deluxe cease exercising its licensed rights" and "that Deluxe pay Monotype an unspecified fee in exchange for the licensed rights Deluxe has been exercising."  C-Cl. ¶ 16.  Monotype's observation that it has not contacted Deluxe's customers or turned off its software, Mem. at 8, is beside the point, where there is no evidence or allegation that Monotype has contact information for any Deluxe customers or has the ability to control the licensed software remotely.  In short, Monotype has done everything within its power, including filing the present litigation, to stop Deluxe from exercising its licensed rights, and has thereby interfered with Deluxe's right to undisturbed use.

Monotype's attempt to portray its retaliatory campaign to bully Deluxe into paying extra for already-purchased rights as a good-faith attempt to enforce the License or resolve a dispute about its scope is disingenuous.  Monotype, as the drafter of the License form and a longstanding

---

[6] Monotype also suggests that Deluxe's admission that it "facilitates customers' selection of typefaces in its website advertising by ***providing samples of text rendered in [Monotype's] fonts***" makes out an additional breach of the License.  Mem. at 9.  If this were true, Deluxe's print advertising featuring samples of text rendered in Monotype fonts would also constitute a breach, as would, indeed, the final printed products Deluxe sells to its customers.  This clearly cannot be the case, and Monotype has never asserted as much.

player in the font industry, knows very well the meaning of the terms "Bitmap" and "Outline" as defined and used in the License. While Monotype asserts that certain provisions of the License contemplate the possibility of litigation in the event of a dispute, these provisions cannot give Monotype free rein to make demands and file suit on grounds that it knows to be baseless. Any such interpretation would vitiate the protections afforded to Deluxe by paragraph 8.06's guarantee of undisturbed use. *See Howe v. Coates*, 97 Minn. 385, 393 (1906) ("The contract must be read as a whole, giving due force and effect to all its provisions.").

Deluxe has built up a substantial portion of its business on the use of Monotype fonts on customer products ordered both via traditional means and over the Internet. It has developed this business in reliance on the License, which authorizes such use. Having to contend with baseless demands and litigation premised on an interpretation of the License that Monotype knows to be incorrect constitutes a disturbance of Deluxe's use of the Licensed Products and a breach of paragraph 8.06. Deluxe is entitled to redress for Monotype's breach.

## II. MONOTYPE HAS VIOLATED MASS. GEN. LAWS CH. 93A AND CAUSED DAMAGE TO DELUXE

Chapter 93A, § 11, protects parties involved in business-to-business relationships against unfair or deceptive acts or practices in the conduct of any trade or commerce. Deluxe has alleged that Monotype's conduct, including repudiating the License and bringing suit against Deluxe, constitutes a violation of c. 93A and has caused damage to Deluxe. Contrary to Monotype's assertions, Monotype's behavior falls within the statute's proscription of unfair or deceptive conduct, and Deluxe's costs in responding to the violation, including attorneys' fees and expenses, constitute compensable damages.

### A. Monotype's Pretextual Assertions of Breach in an Effort to Extract Additional Payment from Deluxe Constitute Unfair Conduct under c. 93A.

Monotype correctly points out that a good-faith (even if ultimately unsuccessful) assertion of disputed rights, or a mere breach of contract, does not rise to the level of a 93A violation. *See*, *e.g.*, *Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47, 55 (1st Cir. 1998) ("We emphasize that this case did not involve a good faith dispute over billing or a simple breach of contract, each of which is an insufficient basis for 93A liability."). However, "[t]he courts of Massachusetts have consistently held that 'conduct in disregard of known contractual arrangements and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes.'" *Id.*, *quoting Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 474 (Mass. 1991). This is precisely what Deluxe has alleged.

Deluxe alleges that, after losing the bid for Deluxe's new web-to-print business, Monotype, presumably disappointed at Deluxe's decision, began asserting for the first time – nearly ten years after Deluxe began accepting orders over the Internet – that Deluxe's use of Monotype's fonts in its Internet-ordering business exceeded the scope of the License.[7] Deluxe has not suggested, as Monotype claims, that Monotype employed this tactic to gain a concession in the form of the lost web-to-print license; rather, the concession Monotype sought was an additional fee from Deluxe for the exercise of rights that Deluxe had already licensed, and for which Deluxe had already paid. Where Monotype knew that its own License, and its own industry, defined "Bitmap" in such a way that Deluxe's Internet-ordering business is covered by the License, Monotype's assertions to the contrary in an effort to extract additional payment

---

[7] Monotype's assertion constituted repudiation of the License. *See Crew v. Flanagan*, 65 N.W.2d 878, 886 (Minn. 1954) (repudiation of a license occurs when one party advises the other "that he no longer considers the articles being manufactured under the license agreement to be covered by that agreement").

from Deluxe fall squarely within the realm of unfair conduct proscribed by c. 93A.  *See*, *e.g.*, *Anthony's Pier Four*, 411 Mass. at 475 ("Anthony's knowing use of a pretext to coerce HBC into paying Anthony's more than the contract required establishes willfulness [and a 93A violation] as a matter of law."); *General Motors Corp. v. Firepond, Inc.*, 16 Mass. L. Rep. 528, *4-7 (Mass. Super. 2003) (where defendant software licensor had lost a bid to provide licensee's next-generation software platform, and in retaliation falsely claimed that licensee was in breach of the existing license and threatened to shut down the existing software unless licensee paid an additional fee, licensor conceded for purposes of summary judgment that such conduct was an unfair or deceptive trade practice within the meaning of c. 93A).  Monotype's continuing attempt, including in its Motion to Dismiss, to obscure the clear import of the term "Bitmap" and misrepresent Deluxe's stated position further compounds its 93A violation.  Deluxe's allegations more than adequately make out an unfair or deceptive act or practice in violation of c. 93A.

### B. Monotype's Violation of c. 93A Has Caused Monetary Damage to Deluxe.

Chapter 93A, § 11, provides a remedy for unfair or deceptive acts or practices in the conduct of trade or commerce where the plaintiff has suffered "any loss of money or property" as a result of the violation.  As alleged in Deluxe's counterclaims, Monotype's 93A violations include sending Deluxe correspondence repudiating the License, using accusations of breach and of trademark infringement to attempt to coerce Deluxe into entering a new licensing arrangement, and bringing an enforcement action against Deluxe based on Deluxe's exercise of its licensed rights.  C-Cl. ¶ 29.  As a result, Deluxe has suffered monetary loss in the form of attorney's fees and other expenses incurred in responding to and defending against Monotype's accusations and the instant lawsuit.  C-Cl. ¶ 30; Prayer for Relief ¶¶ 2, 3.  "If a violation of G.L.

c. 93A, § 11, forces another to incur attorney's fees, those fees are a loss of money or property that may be recovered as G.L. c. 93A damages." *Columbia Chiropractic Group, Inc. v. Trust Ins. Co.*, 430 Mass. 60, 63 (Mass. 1999). While legal fees incurred solely in prosecuting a claim under c. 93A do not satisfy the statute's "loss of money" requirement, legal fees incurred in responding to the violation itself do constitute monetary damages for purposes of § 11.[8] *See Siegel v. Berkshire Life Ins. Co.*, 64 Mass. App. Ct. 698, 703 (Mass. App. Ct. 2005) ("If a c. 93A violation forces someone to incur legal fees and expenses that are not simply those incurred in vindicating that person's rights under the statute, those fees may be treated as actual damages in the same way as other losses of money or property."). Deluxe has also incurred other out-of-pocket expenses in responding to Monotype's 93A violation. *See*, *e.g.*, *Arthur D. Little*, 147 F.3d at 57 (finding loss of money under c. 93A, § 11, where plaintiff had made expenditures such as long-distance telephone calls and faxes in response to defendant's unfair conduct). Deluxe has thus satisfied the requirement to allege loss of money or property resulting from Monotype's unfair or deceptive conduct, and its 93A claim should go forward.

---

[8] Moreover, where both defensive and offensive fees are incurred but the underlying facts are the same, all legal fees will be compensable under c. 93A. *See Columbia Chiropractic Group, Inc. v. Trust Ins. Co.*, 430 Mass. 60, 63-64 (Mass. 1999) ("[Defendant's] allegation that [plaintiff] had no right to recover on its claim was based on the same facts that [defendant] relied on in asserting its G.L. c. 93A claim. There was no need, therefore, to apportion [defendant's] counsel fees between the two claims.").

## CONCLUSION

For the reasons stated above, Deluxe submits that it has adequately pled an entitlement to relief based on Monotype's breach of conduct and violation of c. 93A.  Therefore, Deluxe respectfully requests that Monotype's Motion to Dismiss be denied, and that Deluxe's Counterclaims be allowed to proceed.

Respectfully submitted,

/s/ Jenevieve Maerker
Julia Huston (BBO #562160)
Jenevieve J. Maerker (BBO #670266)
Foley Hoag LLP
155 Seaport Boulevard
Boston, MA 02210
Telephone: 617-832-1000
Fax: 617-832-7000
jhuston@foleyhoag.com
jmaerker@foleyhoag.com

Counsel for Deluxe Corporation

Dated:  April 30, 2012

## CERTIFICATE OF SERVICE

I, Jenevieve Maerker, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 30, 2012.

/s/ Jenevieve Maerker
Jenevieve Maerker