```
                IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS


MONOTYPE IMAGING, INC., et al,    )
           Plaintiffs/Counterclaim )
           Defendants              )
                                   )
        -VS-                        )  CA No. 11-11985-NMG
                                   )  Pages 1 - 25
DELUX CORPORATION, et al,          )
           Defendants/Counterclaim )
           Plaintiff               )



            MOTION HEARING/SCHEDULING CONFERENCE

        BEFORE THE HONORABLE NATHANIEL M. GORTON
             UNITED STATES DISTRICT JUDGE
```

```
                    United States District Court
                    1 Courthouse Way, Courtroom 4
                    Boston, Massachusetts  02210
                    May 10, 2012, 11:15 a.m.
```

```
                    LEE A. MARZILLI
                 OFFICIAL COURT REPORTER
              United States District Court
              1 Courthouse Way, Room 7200
                  Boston, MA  02210
                    (617)345-6787
```

1    A P P E A R A N C E S:

2

3        MARK S. PUZELLA, ESQ., Goodwin Procter, LLP,
     Exchange Place, 53 State Street, Boston, Massachusetts, 02109,
     for the Plaintiffs and Counterclaim Defendants.

4

5        JULIA HUSTON, ESQ. and JENEVIEVE J. MAERKER, ESQ.,
     Foley Hoag, LLP, 155 Seaport Boulevard, Seaport World Trade
     Center West, Boston, Massachusetts, 02210, for the Defendant

6    and Counterclaim Plaintiff.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2          THE CLERK:  This is Civil Action No. 11-11985,

3    Monotype Imaging, Inc., et al v. Deluxe Corporation.  Will

4    counsel please identify themselves for the record.

5          MR. PUZELLA:  Good morning.  Mark Puzella from Goodwin

6    Procter on behalf of the plaintiffs.

7          THE COURT:  Mr. Puzella, good morning.

8          MS. HUSTON:  Good morning, your Honor.  Julia Huston

9    of Foley Hoag for the defendant, Deluxe Corporation.

10          THE COURT:  Ms. Huston.

11          MS. MAERKER:  Jenevieve Maerker, also of Foley Hoag

12    for Deluxe.

13          THE COURT:  And the last name is?

14          MS. MAERKER:  Maerker.

15          THE COURT:  Thank you, Ms. Maerker.  Good morning,

16    Counsel.  We are here on what was originally billed as a

17    scheduling conference, but since then a motion to dismiss the

18    counterclaims has been filed.  And counsel did express a

19    willingness to talk about that, and I'm going to give you a

20    short period of time to address the motion to dismiss.  Before

21    that, just so we're on the same page, let me try to describe

22    what my understanding of the case is.  This is a claim, as I

23    understand it, by the plaintiff corporations for trademark

24    infringement, breach of contract, and a 93A claim.  The

25    plaintiffs allege that its license that is at issue here does

1    not authorize the, quote, "use" of the trademarks.

2         The defendant has filed a counterclaim in this case,

3    and that is what is at issue in the motion.  The plaintiffs

4    have filed a motion to dismiss their counterclaims for breach

5    of contract and a 93A claim.  The issue seems to involve a

6    technology that has changed dramatically since the license was

7    granted back in 1996.  My little statement here is that

8    Internet commerce has evolved -- and I guess that's an

9    understatement -- since 1996.

10        The plaintiff alleges that the Internet-based sales

11   and electronic proofs are prohibited that the defendant is

12   conducting.  The defendant says that the definition of "bitmap"

13   is the crucial issue here and claims that it has been doing

14   what the plaintiff objects to for decades.

15        Do I basically have the claims in mind, first,

16   Mr. Puzella?

17        MR. PUZELLA:  Yes, your Honor.  I could quibble at the

18   edges, but that's the gist of it.

19        THE COURT:  Well, you can certainly quibble at the

20   edges because I am a neophyte in this area and am going to need

21   some guidance, and I do actually have two questions for counsel

22   to address while they briefly argue the motion to dismiss the

23   defendant's counterclaims.  For the plaintiff I would say, you

24   contend that Deluxe violates the licensing agreement in part by

25   allowing third-party Internet users to select and use

1    Monotype's software programs from their own computers.  How

2    exactly are these Internet users using the font software

3    program simply by choosing a font to apply to their business

4    forms on the defendant's website?  I am going to ask the

5    defendants their question, and then I'll let you go for a few

6    minutes, and then we'll go back and forth briefly here.

7           For the defendants, why has the defendant confined the

8    contract dispute to a debate over the meaning of the term

9    "bitmap"?  As the Court understands plaintiff's complaint,

10   defendant's transmissions of electronic proofs to customers is

11   just one use of the software program allegedly in breach of the

12   licensing agreement.  So with that, Mr. Puzella, I will allow

13   you to address briefly your motion to dismiss the defendant's

14   counterclaims for breach of contract and under 93A.

15          MR. PUZELLA:  Thank you, your Honor.  First, to start

16   with your question, your Honor, the question of use is

17   important for purposes of the case, but it is not important for

18   purposes of the motion to dismiss.  The motion to dismiss is

19   premised on whether the defendants have violated the license

20   agreement on terms other than use.  So for purposes of the

21   motion to dismiss, we don't need to get into what we mean by

22   use, but I'll nonetheless answer your question.

23          The way the system works is that the defendant has

24   software on its systems that allow the computers located at

25   Deluxe to render typefaces, and when typefaces are on

1  computers, they're called "fonts."  So their business, as you

2  said, is to create custom checks and forms and those sorts of

3  things.

4      So their traditional business is:  Someone puts a

5  phone call, put down an order in a catalog, would make its way

6  to Deluxe, and a Deluxe employee would sit at a Deluxe computer

7  on Deluxe's premises and key in, physically key in the order

8  into the Deluxe computers, which would access the Monotype

9  software to create the font, and it would be printed, and then

10  that proof, that sample, would be sent to the user.  So that is

11  Deluxe using the software.

12      Move to the modern era.  We're on the Internet now.

13  The customer goes to the Deluxe website, chooses the form that

14  they would like.  A page comes up with the form and a box where

15  you can enter the text, the "United States District Court of

16  Massachusetts," for example.  There's a drop-down menu that

17  allows the user to select the typeface or the font that they

18  would like, Times New Roman.  By selecting that, what's

19  happening is that the user is sending an instruction, by

20  selecting that item in the drop-down menu, the user is sending

21  an instruction over the Internet back to Deluxe's computers.

22  Deluxe has Internet servers that are just computers that have

23  the font software on them that previously Deluxe computers were

24  connected to, that their employees sat at the keyboard.

25      That instruction goes to Deluxe servers.  The Deluxe

1    servers automatically access the Monotype font software, which

2    renders the desired font, Times New Roman in our example, for

3    the words that the user has chosen, "United States District

4    Court of Massachusetts."  The rendering is turned into what the

5    plaintiffs characterize as a .jpg or .swf computer file.  It's

6    a picture.  Those computer files are then transmitted back over

7    the Internet to the user's Web page display, and they can see

8    exactly what it is that they've selected, so their text in

9    Times New Roman as transmitted back from Deluxe.

10           So rather than, under what the license contemplates, a

11   Deluxe employee using the software at their location, we now

12   have a scenario, thanks to the Internet, where they've

13   effectively outsourced the proofing process so that the

14   consumer sitting at their computer can send instructions to the

15   Deluxe computers directly.

16           THE COURT:  If they didn't have the drop-down menu and

17   just saw the font itself without the name, would that be in

18   violation of the license?

19           MR. PUZELLA:  That would address the trademark issues

20   because in the drop-down menus they use the trademark terms of

21   the typefaces, right?  So in some cases, as they do, they use

22   "your company name here," you know, in the actual font, as

23   opposed to the name of the font.  That would address that

24   issue.  But what's happening is, they're allowing the user to

25   access the font software, provide instructions to it, and then

1   receive the output of those instructions; namely, a rendered

2   font.  So that's the use issue, okay?

3          But as I started with, that's not an issue that the

4   Court needs to address in the context of the motion to dismiss

5   because, as the Court noted, there are several breach of the

6   license agreements that are at issue here.  Use is one of them.

7   It's the first one.

8          If I can just step back for a moment to address the

9   motion to dismiss.  So the defendants in their counterclaim

10  allege that Monotype has breached the agreement; in particular,

11  I think Paragraph 8.06.  Does the Court have the license handy?

12  I have a copy if you need it.

13         THE COURT:  I think I do have the license somewhere,

14  but I'm not sure I can put my hands right on it.  Is it

15  attached?

16         MR. PUZELLA:  It should be attached to the complaint,

17  your Honor.

18         THE COURT:  Exhibit 1, yes, I have it.

19         MR. PUZELLA:  So if the Court would turn to 8.06,

20  Page 5.

21         THE COURT:  8.06?

22         MR. PUZELLA:  Yes.  It's the signature page, your

23  Honor, Page 5.

24         THE COURT:  Yes.

25         MR. PUZELLA:  So the counterclaim is based on this

1    sentence:  "Deluxe shall be entitled during the term of this

2    license to use the license products without disturbance,

3    subject only to performance of its obligations hereunder."

4         So from Monotype's point of view, that raises two

5    questions:  One, has Monotype disturbed Deluxe in its use?  If

6    it hasn't, there's no breach of contract.

7         The second question:  This provision seems to suggest

8    that if Deluxe has not satisfied its obligations under the

9    contract, that this sentence just falls away, they're not

10   entitled to be free from disturbance.  So on the factual

11   question of whether Deluxe has been disturbed, this is a

12   straight-down-the-middle motion to dismiss issue.  There's an

13   absence of facts on disturbance.

14        The only facts that defendants allege as to how it is

15   that Monotype has disturbed it, they all relate -- and it's

16   convoluted in their answer and counterclaims and in their

17   opposition -- but they all relate to the mere filing of this

18   litigation.  There are no claims that Monotype has reached out

19   to Deluxe's customers, that Monotype has turned off the

20   software, that Monotype has done anything to disturb Deluxe's

21   use.  In fact there's no dispute, I believe, that Deluxe

22   continues to use the software today, and it's doing so as it's

23   done for -- well, since 1996.  So there's a lack of facts on

24   this notion that Monotype has disturbed their use.

25        Now, that brings us to the second point.  Let's assume

1    that there is a disturbance.  It doesn't matter if Deluxe has

2    not otherwise performed under Paragraph 8.06.  In the answer in

3    counterclaims, Deluxe has conceded, it's our position, that

4    they have, by providing the user with a proof or a sample in

5    the form of a .jpg file or a .swf file, they have violated the

6    prohibition in the agreement that prohibits their delivery of

7    the licensed products to third parties.

8         Now, "licensed products" is a defined term.  It's on

9    the first page.  It's Paragraph 1.01(d), and in licensed

10   products we see that it includes bitmaps.  "Bitmaps" is also a

11   defined term.  That's 1.01(a).  "Bitmap means a machine-

12   readable digital representation of a single typeface style in a

13   fixed resolution, weight, width, format, and point size."  So

14   that's where we get to the --

15        THE COURT:  I'm sorry.  Where are you reading that

16   one?

17        MR. PUZELLA:  1.01(a).  It's just four above "licensed

18   products."

19        THE COURT:  Oh, okay, I've got it, yes.

20        MR. PUZELLA:  So the question then, is the conceded

21   file that goes to the user -- there's no dispute there -- is it

22   a bitmap?  Monotype contends that it is.  The plain language

23   would suggest that it is.  It is machine readable because what

24   is it?  It is a computer file that's created by the font

25   software.  They don't dispute that.  It's a .jpg or it's an

1    .swf file.  That computer file is sent from Deluxe over the

2    Internet to the user's computer.  By definition, because it's

3    sent over the Internet, it is in machine-readable form.  The

4    user's computer reads it and displays it on the screen, so it's

5    in machine-readable form.

6            It is a digital representation because it is digital

7    for the very same reasons that it's machine readable.  It's not

8    physical.  It's not printed on the page as their proofs used to

9    be that went through the mail.  It's digital.  It's a

10   representation of a single typeface style because what is it?

11   It is a picture of what the consumer selected, "United States

12   District Court" in Times New Roman.  So it's a single typeface

13   style, Times New Roman, and because it's a picture, it's fixed.

14   Resolution, weight, width, format, and point size, that list of

15   things are merely characteristics of typefaces and fonts.

16           I don't want to go into how fonts work, but you can

17   imagine just from using Word that there are different sizes of

18   fonts.  You can have 10-point, you can have 12-point.  Lawyers

19   I would imagine from time to time try to play with fonts to get

20   pages, and the Court has probably experienced that.  All this

21   means is, it's in a specific weight, width, format, and so

22   forth.  It is because it's a single image of that typeface, and

23   that's what's sent.  So Monotype's position is that what is

24   sent from Deluxe to the user is a bitmap.

25           Now, because Deluxe concedes as much in its answer,

fd09ed44-c71d-4710-8089-759ecae97053

Page 12

1    there can be no right to be free from disturbance because

2    they've conceded essentially that they've breached the

3    agreement.

4         THE COURT:  All right, I think I understand the

5    position, and I will hear from the defendants.  Thank you,

6    Mr. Puzella.

7         MR. PUZELLA:  And if I may, there are 93A arguments as

8    well that I can address later.

9         THE COURT:  Thank you.

10        Who will be speaking for the defendants?

11        MS. MAERKER:  I will, your Honor.  Thank you.

12        THE COURT:  Ms. Maerker?

13        MS. MAERKER:  Maerker, yes.  It rhymes with "worker."

14        THE COURT:  Okay, good enough.

15        MS. MAERKER:  So, first of all, I agree with

16   Mr. Puzella that the question of use is not at issue in the

17   motion to dismiss here.  We obviously differ on whether

18   Deluxe's system allows customers to use the software, but the

19   Court asked why Deluxe has focused on the interpretation of the

20   word "bitmap," and the reason is that the other two alleged

21   breaches turn on whether the electronic images that Deluxe

22   sends to its customers are or are not bitmaps.  Monotype says

23   that those images breach the license because Deluxe is sending

24   them to third parties and because the third parties can print

25   them on any number of computers.  The question is whether they

1    are bitmaps that fall within the scope of what the license

2    restricts.

3             So Deluxe's two counterclaims for breach of the

4    guarantee of undisturbed use and for 93A are both based on

5    allegations that Monotype has been interfering with Deluxe's

6    exercise of its licensed rights.  Deluxe has alleged that

7    Monotype was upset about losing out on a bid for a new business

8    model that Deluxe was developing and has come up with a

9    pretextual reason to try to extract additional money from

10   Deluxe for its already licensed use.  Deluxe, as Mr. Puzella

11   pointed out, has been exercising these rights for a long time

12   openly on the Internet in the model that we're referring to.

13   Monotype has a duty to police its trademarks, and Deluxe has

14   been using Monotype's font names in that context, and

15   apparently Monotype didn't have a problem with Deluxe's use

16   until it lost out on this recent bid.  Since that time,

17   Monotype has been --

18            THE COURT:  In other words, you don't say that it has

19   anything to do with the advancements in technology and the

20   Internet-based sales and so forth?

21            MS. MAERKER:  Well, no, because the Internet-based

22   sales have been going on for about ten years, and only after

23   losing out on this recent bid for a different type of product

24   line has Monotype started sending increasingly aggressive

25   correspondence demanding that Deluxe stop using its licensed

1  rights, and that Deluxe pay Monotype additional money for

2  rights that it already purchased, and even gone so far as to

3  file this litigation.  These are clearly disturbing Deluxe's

4  use.  Mr. Puzella says, "Well, we haven't turned off the

5  software, we haven't contacted customers," but there's no

6  allegation that they have the power to turn off the software

7  remotely.  They've done everything that they can in their power

8  to stop Deluxe from using its licensed rights.

9         The same behavior is also a clear violation of

10 Chapter 93A.  It's true that a run-of-the-mill contract dispute

11 doesn't rise to the level of a 93A violation, but that's not

12 what Deluxe is alleging.  Deluxe alleges that Monotype, again,

13 was annoyed that it lost a new business opportunity, and

14 therefore came up with a pretext to try to get more money out

15 of the existing license.  That kind of contract is consistently

16 held to run afoul of 93A.

17        What's more, as to the 93A damages issue, the case law

18 is clear that hiring counsel to respond to a 93A violation

19 amounts to monetary damages under the statute.  So Monotype's

20 motion to dismiss is based on a little bit of smoke and mirrors

21 as to the meaning of the term "bitmap."  They say Deluxe admits

22 that it sends these images of text rendering the font to its

23 customers, and therefore Delux admits that it's breaching the

24 license, and therefore our conduct is justified; but that is of

25 course the ultimate issue in the case, and it's one that you

1    don't actually have to decide on the motion to dismiss.

2         I will, if your Honor is interested, point to a few

3    elements in the license that Mr. Puzella --

4         THE COURT:  Well, I gave him a little latitude, so

5    I'll give you the same, but just a couple of minutes.

6         MS. MAERKER:  Sure.  So the term "bitmap" is

7    juxtaposed with the term "outline."  Both of them are included

8    in the definition of licensed products.  So licensed products

9    is 1.01(d) and includes "outlines, bitmaps, printer, or screen

10   fonts."

11        "Outline" is a definition that is similar in many ways

12   to the definition of "bitmap."  They're two different forms of

13   font software.  "Outline means a machine-readable digital

14   representation of a single typeface style in a fixed weight/

15   width in PostScript Type 1 format that may be represented in

16   varying resolutions."

17        So the Court may notice that unlike the definition for

18   bitmap, outline does not specify a fixed point size.  This

19   makes sense in light of what the terms "bitmap" and "outline"

20   mean in the broader world in the context of font software.

21   They are two formats that can be used to create font software.

22   Bitmap fonts are created from an array -- each letter is made

23   of an array of dots or pixels, so that when you scale it up or

24   down, it looks pixelated, it loses its lines.  So that a bitmap

25   font comes in a complete set of characters for every different

1   point size.  You'll have a set of characters for 8-point and

2   10-point and 12-point.  This makes sense in light of the

3   definition of the term "bitmap" is a machine-readable

4   representation of a typeface in a particular point size.

5   Outline fonts are different.  They're described by lines and

6   curves, the outlines of letters, and they can be scaled to any

7   size.  So the "outline" definition naturally does not say that

8   it's only in a fixed point size.

9           PostScript Type 1 format is a common computer language

10  that's used for outline fonts.  And, again, I would say machine

11  readable is referring to software as opposed to human readable,

12  which is what the plaintiff's brief calls the images that

13  Deluxe sends to its customers showing a human readable

14  rendering of the text in a given typeface.  So all this goes to

15  say that these two definitions in the license are referring to

16  two different kinds of font software, and the term "bitmap" in

17  the context of this license, as Monotype well knows, is a form

18  of software and is not referring to the electronic images that

19  show the output of the software.  So it's the software that the

20  license restricts, not the output, not the result of the

21  software.  If it did restrict that, it would be absurd.  In

22  fact, I mean, that's the point of the license is that Deluxe

23  can use the software to create images of text in a given font

24  and send it to its customers.  That's what its business is.

25           But, as I said, that goes to the ultimate issue in the

fd09ed44-c71d-4710-8089-759ecae97053

1  case, or at least one of the ultimate issues, and it's not one

2  that the Court needs to decide on this motion to dismiss.

3  Monotype doesn't get to prevail on a disputed issue of contract

4  law by essentially ignoring the dispute.  Deluxe has stated a

5  valid claim for breach of the guarantee of undisturbed use and

6  the 93A violation, and it's alleged facts to support them, and

7  the claim should be allowed to go forward.

8           THE COURT:  All right, thank you, Ms. Maerker.

9           A brief rebuttal, Mr. Puzella, one minute.

10          MR. PUZELLA:  Thank you, sir.  We shouldn't get

11  distracted.  In our motion we point out that there are several

12  other provisions that Deluxe has violated in connection with

13  the agreement, and those other provisions also illustrate how

14  it is that they're not entitled to disturbance.  For example,

15  4.02 says that they cannot provide any of the licensed

16  materials to third parties in any form, so that also takes care

17  of a dispute concerning the meaning of "bitmap."

18          Moving on to the 93A issues, there's no "there" there.

19  There are no facts to support an allegation that Monotype has

20  done anything but assert good-faith licensed rights against

21  Deluxe.  We negotiated for a year, and the complaint doesn't

22  have a single line about any suggestion by Monotype that the

23  purpose of this -- that this litigation was anything but to

24  protect its licensed rights.  There's nothing in the complaint.

25  It's a leap of faith, it's a bald allegation, and it's not

Page 18

1   enough to support it.

2       On this question of damages, the defendant points the

3   Court, I believe, to Paragraph 30 of the complaint and

4   Paragraphs 1 and 2 of its Prayer For Relief to suggest that it

5   did indeed allege damages in the form of attorneys' fees.  I

6   think if the Court looks at those three paragraphs, the Court

7   will see that they did not.  There's, again, an absence of

8   facts just as there is with disturbance.  Thank you.

9       THE COURT:  All right, thank you, thank you.

10      Any rebuttal from you, Ms. Maerker?

11      MS. MAERKER:  I would simply point out that the other

12  paragraphs of the license to which Mr. Puzella refers all

13  depend on whether licensed products, and therefore bitmaps,

14  includes the pictures that Deluxe is sending to its customers.

15      THE COURT:  Thank you.  All right, I'm going to take

16  that motion under advisement, but we do need to proceed to the

17  scheduling portion of this proceeding, since no matter what I

18  do on the motion to dismiss, this case will proceed.  I have

19  received the appropriate certificates in accordance with local

20  Rule 16.1.  I just want to make sure that you both actually

21  have written signatures of your respective clients rather than

22  just electronic signatures.  I understand that the original

23  signatures do not need to be filed, but what I do want is the

24  fact that you have sat down or talked to by phone your

25  respective clients about ADR and budgets, and that Ms. LaBreck

1  in the case of Deluxe and Ms. Dunlop in the case of Monotype

2  have actually signed a piece of paper.  Do you have that?

3          MR. PUZELLA:  Your Honor, my client has not physically

4  signed a piece of paper, but we have indeed at great length

5  worked out these issues, so we can provide that to the Court.

6          THE COURT:  All right.  What we have found, at least

7  in this session, where a client has to sit down with counsel

8  and talk about the fact that there are ways to resolve cases

9  short of spending a year or two in Federal Court and they sign

10  a piece of paper that at least they think is going to be on

11  file with this court is important.  It's therapeutic.  That's

12  why I make you do it.  Obviously I don't make you file that

13  written signature with the court, but I want to know that

14  counsel have in their possession such a signature.

15          What about your client, Ms. Maerker?

16          MS. MAERKER:  Just as Mr. Puzella said, we have

17  discussed extensively alternative courses for resolving this

18  litigation at lower cost.  Ms. LaBreck has not yet signed an

19  actual piece of paper, but we're happy to get her to do that.

20          THE COURT:  All right, I want her to do that.

21          MS. MAERKER:  Sure.

22          THE COURT:  And I will expect that you will notify the

23  court that you have them.  You certainly don't have to file

24  them, but I want to know that you have them, okay?

25          MS. MAERKER:  Certainly.

1       THE COURT:  All right, then turning to the joint

2   statements, I think we can turn it into my format.  I am

3   intrigued that you have both apparently agreed that this matter

4   will be determined both as to liability and damages by virtue

5   of a bench trial rather than a jury trial.  Is my understanding

6   correct?

7       MR. PUZELLA:  Your Honor, that's my understanding with

8   respect to liability but not damages.

9       THE COURT:  Well, the proposed schedule shows that a

10  bench trial on liability will occur at one stage and then later

11  on a bench trial on damages, if necessary.  Isn't that the

12  agreement on Page 3 of the statement at the bottom, the last

13  entry?

14      MR. PUZELLA:  I'm looking at it, your Honor, and I

15  apologize, I missed that.  I intended a bench trial on

16  liability but a jury trial on damages.

17      THE COURT:  What says the defendant in that regard,

18  Ms. Huston?

19      MS. HUSTON:  Thank you, your Honor.  Our understanding

20  was that the parties had agreed to a bench trial, both on

21  liability and damages, and Mr. Puzella's office had actually

22  prepared this document.

23      THE COURT:  Okay.  And maybe it's not unanimous

24  anymore, but at least at the time it was agreed that this would

25  be a bench trial rather than a jury trial, correct?

1          MR. PUZELLA:  On the issues of liability, your Honor.

2     If it was mistakenly put in as a bench trial as our position,

3     it was a mistake, and it's my responsibility.

4          THE COURT:  All right, if you feel that there are

5     reasons why I should not schedule this as a bench trial both

6     ways, I'm going to allow you to brief that, but as of now,

7     you've told me that it's to be a bench trial, so when I'm

8     making up these dates, I have that in mind.  So if you think

9     you have reason to change that, then you'll have to apply to

10    the Court, okay?

11         MR. PUZELLA:  Understood.  I'll discuss it with my

12    client.

13         THE COURT:  Okay.  Then going down through the dates,

14    automatic discovery I guess you've already accomplished, but

15    we'll put today's date down, May 10.  I do like to break fact

16    discovery into written and oral, so we will say written

17    discovery will be served on or before June 30, answered by

18    July 31, and then completion of all fact discovery -- again, I

19    like to use the last day of the month, so we'll say

20    September 30 of this year.  Experts to be designated and

21    Rule 26 reports exchanged on October 31; rebuttal experts, if

22    any, the same designated and reports by November 30; and

23    conclusion of expert depositions by December 21.  Motions for

24    summary judgment -- that is, dispositive motions -- will be

25    filed on or before January 31 of next year; oppositions by the

1    end of February, February 28.  And then giving the Court a

2    month or two to resolve that, I would like to put dates in here

3    rather than number of days after.  I'm going to give myself a

4    deadline and will decide those dispositive motions within at

5    least two months, so that we'll say that if the case is not

6    resolved otherwise, we will have a bench trial on liability

7    just about a year from now, early May of 2013.  Since we

8    impanel on Mondays and this is a bench trial, we should do it

9    toward the end of a week.

10           THE CLERK:  So the 8th or the 9th.

11           (Discussion between the Court and Clerk.)

12           THE COURT:  Thursday, the 9th of May, 2013, will be

13   the bench trial on liability.  Then again giving myself a

14   deadline, and understanding that I want to complete this case

15   under all circumstances in 18 months, we'll say that my

16   decision will be rendered by the end of May, the clock will

17   start running on your 60 days, and close of fact discovery on

18   damages will be July 31 of next year; close of expert discovery

19   with respect to damages two months later, not three,

20   September 30 of 2013; and then a bench trial on damages, at

21   least as of now, would be the end of October, just about

22   18 months from now.

23           (Discussion between the Court and Clerk.)

24           THE COURT:  Thursday, the 31st, Halloween of 2013

25   we'll have a bench trial on damages, unless it's determined

1    between now and then that it should be a jury trial.

2          Any problem with any of those dates, Counsel?

3          MS. HUSTON:  No problems, your Honor.  I would just

4    ask for one clarification.  If the plaintiff moves for summary

5    judgment, we would like the ability to cross-move for summary

6    judgment by the opposition deadline.  That's why we had phrased

7    it in our proposal as "oppositions and cross-motions for

8    summary judgment."

9          THE COURT:  And then opposition to that would be by --

10   21 days in that case -- by March 21 any opposition to the cross

11   motion, and then that gives me a month or so before the bench

12   trial.  It's tight, but we'll do it.

13         MS. HUSTON:  Thank you, your Honor.

14         THE COURT:  Okay?  Anything else?

15         MR. PUZELLA:  No, your Honor.

16         THE COURT:  The plaintiff is satisfied with those

17   dates?

18         MR. PUZELLA:  Yes, your Honor.

19         THE COURT:  All right, the only other thing that we

20   generally try to schedule at this stage is some sort of

21   mediation.  Midstream we find that it works best, in this case

22   perhaps after fact discovery but before you've gotten into all

23   of the experts.  What about October or November of this year

24   for mediation?  Does that make sense, Mr. Puzella?

25         MR. PUZELLA:  Well, your Honor, the parties are

1  engaged in active settlement discussions now.

2        THE COURT:  Well, that's of course the best way to

3  resolve it.

4        MR. PUZELLA:  Yes, your Honor.

5        THE COURT:  In fact, we're willing to convene

6  mediation sooner than that if it would be helpful.

7        MR. PUZELLA:  And that may be the case, and I've

8  raised this concept just today with the defendants.  It may be

9  helpful to schedule mediation in the fall after the close of

10 fact discovery; but it may be the case, and in fact I will put

11 it at fifty/fifty, that we may come to the Court looking for an

12 earlier date for mediation.

13        THE COURT:  Well, that's fine.  If you want, we can

14 use a default position, we would schedule it for October or

15 November, but if you want it earlier, we'll be glad to give it

16 to you.

17        MS. HUSTON:  That's fine, your Honor.  Thank you.

18        THE COURT:  All right, we'll schedule it then for

19 what, October or November?  Which is your preference?

20        MR. PUZELLA:  I think October, your Honor.

21        THE COURT:  October it will be, and it would be

22 referred to one of the magistrate judges.  I can't remember

23 which one is assigned to this case.  I think I wrote it down

24 somewhere.

25        THE CLERK:  Bowler.

Page 25

1      THE COURT:  It's Bowler.  She is known as being one of

2  the best mediators around.  You don't generally get out of her

3  session without settling a case.  But if she has been involved

4  earlier, then it would not be assigned to her if she's had any

5  involvement with the case up to that point.  Otherwise, it may

6  well be assigned to her.

7      Is there anything else that the Court can do at this

8  stage with respect to scheduling that would help move the case

9  along?  Mr. Puzella?

10     MR. PUZELLA:  No, your Honor.

11     THE COURT:  Or Ms. Huston?

12     MS. HUSTON:  No, your Honor.  Thank you.

13     THE COURT:  Thank you.  Good luck.

14     (Adjourned, 11:53 a.m.)

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

    UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS     ) ss.
    CITY OF BOSTON                )
5

6

7          I, Lee A. Marzilli, Official Federal Court Reporter,

8   do hereby certify that the foregoing transcript, Pages 1

9   through 25 inclusive, was recorded by me stenographically at

10  the time and place aforesaid in Civil Action No. 11-11985-NMG,

11  Monotype Imaging, Inc., et al v. Deluxe Corporation, and

12  thereafter by me reduced to typewriting and is a true and

13  accurate record of the proceedings.

14      In witness whereof I have hereunto set my hand this 14th

15  day of May, 2012.

16

17

18

19

20          /s/ Lee A. Marzilli

21          _____
            LEE A. MARZILLI, CRR
            OFFICIAL COURT REPORTER
22

23

24

25